FILED
2026 Sep-18 AM 09:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| ELIOTT BOND and ASHLEY BOND,<br><br>Plaintiffs,<br><br>v.<br><br>DENNIS E. GOLDASICH, JR., GOLDASICH VICK & FULK n/k/a GOLDASICH VICK & MCCARTNEY, CURT THOMPSON, and JONATHAN WATTS,<br><br>Defendants. | ) | CIVIL ACTION FILE<br><br>________________________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DEFAMATION

Plaintiffs Eliott Bond and Ashley Bond, by and through their undersigned counsel, state their Complaint against Defendants Dennis E. Goldasich, Jr., Goldasich Vick & Fulk n/k/a Goldasich Vick & McCartney (the "Goldasich Firm"), Curt Thompson, and Jonathan Watts (collectively, "Defendants"), as follows:

## INTRODUCTION

1. Plaintiffs are a married couple. Plaintiff Eliott Bond started a company, Hedge Enterprises, Inc. d/b/a BetU ("BetU"), a social gaming mobile application allowing users to wager directly with one another. Plaintiff Ashley Bond has never held a position at BetU.

2. Defendant Thompson—a longtime friend of Plaintiff Eliott Bond's mother and father—became an adviser to Plaintiff Eliott Bond and BetU and was initially awarded equity for his planned contributions; Thompson would later become COO of BetU. Defendant Watts, an acquaintance of Defendant Thompson, became an investor in BetU.

3. In June 2024, Defendant Thompson appeared to have quiet quit his position at BetU, and BetU took steps to effect that termination through restricted access to company systems. Since that time, Defendants have been on a crusade to take over BetU; through the lies subject of this defamation lawsuit, threats, and eventually through litigation in Fulton County, Georgia (the "Fulton County Litigation"). Defendant Goldasich and the Goldasich Firm are counsel to Defendants Thompson and Watts in the Fulton County Litigation.

4. First, in the midst of repeated demands for records and threats of litigation, Defendants Thompson and Watts requested that BetU install a three-member Board of Directors with the three of them each holding a position, such that they would largely control the company and Plaintiff Eliott Bond's employment at the company he founded.

5. Second, that failing, Defendants Thompson and Watts demanded that Plaintiff Eliott Bond "buy out" their shares in BetU, ostensibly knowing both that he was unable to do so and that their ownership stakes made it difficult for BetU to raise

capital elsewhere.

6. Third, beginning no later than July 2024,[1] after Plaintiff Eliott Bond did not accede to the demand for board positions or to complete any buy out, Defendants pivoted and began leveling highly salacious, false, and defamatory accusations about Plaintiffs.

7. Defendant Thompson began viciously defaming Plaintiffs, and in a fashion that would have caused Plaintiff Eliott bond to lose control of his own start-up if true.

8. On or about July 24, 2024, Defendant Thompson showed up at Plaintiff Eliott Bond's parents' home, largely unannounced, and falsely accused said Plaintiff of being addicted to drugs—cocaine specifically—stealing money from BetU, and needing rehab, Plaintiff Ashley Bond of stealing BetU funds for luxury purchases, and as a result, both Plaintiffs of being incapable of taking care of their children. Those and each of the other accusations subject hereof are entirely false and were made up out of whole cloth.

9. Shortly after, Defendant Watts requested a meeting with Plaintiff Eliott Bond in which he leveled the same allegations of narcotics abuse—cocaine and Adderall—and claimed Watts and his wife had identified a rehab facility for him to

[1] Plaintiffs only seek to establish liability on the basis of defamatory publications occurring within the two year period prior to filing this action, but the earlier statements provide meaningful context and are aggravating factors.

attend.

10. After Plaintiff Eliott Bond sent cease and desist correspondence, Defendants Thompson and Watts appear to have retained Defendants Goldasich and the Goldasich Firm to further their efforts to take over BetU, including to put so much financial pressure on Plaintiff Eliott Bond that he would give up his company.

11. On or after September 21, 2024, and continuing thereafter, Defendants attempted to leverage another parent-child relationship. Ostensibly without much of a preexisting relationship, Defendant Goldasich approached Dr. George Turnley, Sr.—also an investor in BetU and father to one of Plaintiff Eliott Bond's oldest friends also involved with BetU—and accused: (1) Plaintiffs of abusing illegal narcotics, (2) Plaintiffs of misappropriating and misusing company funds for their drug use and luxury purchases, (3) Plaintiff Eliott Bond of committing theft of company funds, (4) Plaintiff Ashley Bond of having a history of arrests for prescription-drug related offenses, and (5) Plaintiffs of engaging in a scheme involving fake Adderall prescriptions in order to obtain drugs.

12. Fourth, and perhaps waiting for the shorter Georgia statute of limitations for defamation actions to expire and knowing that neither BetU nor Plaintiff Eliott Bond were able to re-purchase their shares in BetU, Defendants then filed suit against Plaintiff Eliott Bond in a derivative action on August 4, 2025, seeking, among other things, to be repaid their investments, punitive damages, and

the appointment of a receiver for BetU. Their lawsuit, though 240 paragraphs, makes no mention of the defamatory allegations set forth herein.

13. After the conclusion of a mediation, in February 2026, Defendant Goldasich approached Mr. Scott Barranco, a Director of and investor in BetU, and made the same financial misconduct allegations, including that Plaintiff Eliott Bond stole from BetU's player-funds accounts via fake BetU accounts he had created, and asserted that Plaintiff Eliott Bond made material misrepresentations to Mr. Barranco in order to obtain his investment.

14. While making his false and defamatory accusations about Plaintiffs, Defendant Goldasich was acting on behalf of his firm as well as the authorized agent of Defendants Thompson and Watts and in furtherance of their goals and representation.

15. This is accordingly an action for defamation to hold Defendants liable for their false, defamatory, and malicious accusations against Plaintiffs.

**PARTIES, JURISDICTION, AND VENUE**

16. Plaintiff Eliott Bond is a citizen of the state of Georgia, residing in Atlanta.

17. Plaintiff Ashley Bond is a citizen of the state of Georgia, residing in Atlanta.

18. Plaintiffs are private individuals who are private figures for the

purposes of this defamation litigation.

19. Defendant Goldasich is a citizen of the state of Alabama who, upon information and belief, resides in this District.

20. Defendant Goldasich Firm is an unincorporated partnership with its sole office located in this District.

21. Defendant Goldasich Firm and its partners are citizens of the state Alabama.

22. Defendant Thompson is a citizen of the state of Alabama and resides in this District.

23. Defendant Watts is a citizen of the state of Alabama and resides in this District.

24. This Court has personal jurisdiction over all Defendants.

25. Defendants published the defamation at issue here in Alabama to Alabama citizens, and in Georgia to an Alabama citizen.

26. Although registered in Delaware and headquartered in Atlanta, much of BetU's user base, investors, marketing efforts, and reputation has been centered in Alabama.

27. There exists complete diversity of citizenship between Plaintiffs on the one hand, and Defendants on the other hand.

28. The amount in controversy exceeds $75,000, exclusive of interest,

costs, and attorneys' fees.

29. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

30. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2)-(3) and 1391(c)(1)-(2).

## **FACTUAL BACKGROUND**

### Formation of BetU and Roles of Parties

31. Plaintiff Eliott Bond formed BetU in 2021.

32. Plaintiff Eliott Bond is the Founder and CEO of BetU.

33. In March 2023, Defendant Watts invested $100,000 in BetU, including due to his close relationship with Defendant Thompson. He subsequently made an additional investment of $100,000 in June 2024.

34. Another acquaintance of Defendant Thompson and Watts invested a total of $300,000. Fifty Thousand Dollars of that investment, however, was hand-delivered in cash by Defendant Watts to Defendant Thompson in March 2024; it was never deposited into a BetU account and, to Plaintiff Eliott Bond's knowledge, Defendant Thompson has never accounted for it despite repeated efforts by Plaintiff.

35. In August 2023, Defendant Thompson executed his share-award agreement and Thompson was promoted from an adviser to the titles Co-Founder, President, and Chief Operating Officer.

36. BetU launched its mobile application in September 2023.

Defendant Thompson is Terminated for Cause

37. For a period of months, the working relationship between BetU, Plaintiff Eliott Bond, and Defendant Thompson worked reasonably well.

38. In the spring of 2024, however, the relationship with Defendant Thompson began to unravel and, with it, the relationship with Defendant Watts.

39. Defendant Thompson became overtly hostile, threatening, loud, insulting, and vindictive.

40. Both Defendants Thompson and Watts, without any evidence of wrongdoing, began threatening litigation against Plaintiff Eliott Bond, on the apparent bases that Plaintiffs were using BetU funds for their personal benefit, including for drugs; or at least that was the context in which their threats and demands were made.

41. On April 29, 2024, Defendant Thompson requested and received financial information regarding BetU's expenses from Plaintiff Eliott Bond.

42. Defendant Thompson did not then question any financial transaction shown, excepting perhaps a few he had directed as COO.

43. On or around June 3, 2024, Defendant Thompson printed the spreadsheet.

44. On June 10, 2024, Defendant Thompson sent multiple emails to

Plaintiff Eliott Bond, demanding additional financial records and asserting "I will no longer be kept in the dark here."

45. When queried by Plaintiff Eliott Bond about the $50,000 cash investment for accounting purposes, Defendant Thompson became irate, asserted it was an accusation of theft, and Defendant Thompson's work with BetU effectively ended then and there, with his formal termination following shortly after.

Defendants' Initial Efforts to Control BetU

46. With Defendant Thompson operationally out, he and Defendant Watts came up with an idea to gain control of BetU.

47. On or around July 1, 2024, Defendant Watts requested a three-person Board of Directors comprised of Defendants Thompson and Watts and Plaintiff Eliott Bond. Plaintiff Eliott Bond declined.

48. On July 2, 2024, Defendant Thompson made, among others, the following statements to Plaintiff Eliott Bond, while calling him "Chief," "dude," "bud," or "Eliott" more than 200 times in the span of a single ~85 minute conversation:

a. "Eliott, there was never a time in my life where I signed up to work for you, nor did you sign up to work for me. We are business partners. And when you have a business partner, the only way that you shed that business partner is either you buy that business partner out or the business goes away."

b. "But in order for me to go away, then you either have to find a way to buy me out or I'm gonna stay here and be in your side forever."

c. "And no matter what you say or feel about Curt Thompson, Eliott, your dream became a reality when you met me…. and there's an emotional side to it that just is no longer acceptable to me…. I, don't take this the wrong way, Eliott, but I would never sign up in a million years to report to you."

d. "Eliott, I am your business partner. Until you can find a way to buy me out, I don't go away. I, if I were quitting the company, I would send you a fucking email that says I resign my position as an officer of the company to provide myself the protection that I will need."

e. "Eliott, I can choose to never take your call again and it doesn't change the fact that I own 20% of this business. And you have three investors that own 35 and some change [percent, including Defendants Thompson and Watts] of this business that are not fucking happy right now."

f. "Eliott, you don't have to like me, we don't have to hang out, but until you can find a way to get rid of me financially, you, there's nothing you can do about that…. How do you make Watts go away?"

g. "And so now we sit, you don't like Curt anymore, but, but, but Curt, Curt doesn't go away until you figure out a way to make him go away."

h. "I'm 52 years old, Eliott. I don't play games. That's silly."

i. "Eliott, you will get a full accounting of the $50,000 in cash that was here, but you know I was smart enough to retain that cash so that I didn't get burned with a bunch of fucking expenses. And I've got tens of thousands of dollars that I've spent on this company out of my account, that is unacceptable. And you don't think anything about it when you come over and have lunch at the club or you have a couple of transfusions at the club and we play golf and it's $225, but those are real dollars that come out of my bank account, right?"

j. "… my credit card might work, it might not work, you might turn. That's, Eliott, that's sixth grade stuff, man. I'm 52 fucking years old, rich, rich dude that doesn't put up with that. I'm sorry. That's just, we get to a place in life and your day will come where you get to a place

where you go, 'Fuck you. I don't need that in my life.' And that's where you put me, Eliott."

k. "My only interest at this point is trying to monetize something for the two and a half years of my life that I gave Eliott Bond. I'm sure when I die and get to heaven, I'll get a gold star for that service. But until that time comes, Eliott, I'm not gonna spend my time doing something for you if it's not gonna produce any dividends for me in my life financially."

l. "Eliott, first of all, I'm gonna tell you something real quickly. If you take that tone with me again, it's gonna be a problem because I'd ask for the same accounting for you. And do you think for a second there's any money that I owe this company, Eliott? … Eliott, I'd like to understand where the last $700,000 went if we only have 500 users. That's why you can't make a statement like that."

m. "I've got three months for the country club bills to go through that you'll get a, an accounting for as well. I don't owe you that, and I know it's not because you're trying to do the books. So it's because you don't trust me and you imply that I've stolen some money from the company – I did not. Which is a fucking problem."

n. "…I got a lot at stake, and so do you… I've got two and a half years of my life, Eliott, and I had a 10 to $20,000 a month consulting job that I turned off. And so I've got a lot invested in this and the only outcome that is meaningful to me is an exit strategy for the business."

o. "But at a minimum, Eliott, you got to get a board set up and I got to be on it. And you need to have Watts on it."

p. "I would tell you this, Eliott. Let's do something in the short term here. Get my email turned back on. There's a lot of information there that I unfairly no longer have…. But, uh, out of respect for me, Eliott, and, and my personal relationship with your family, I would ask you to turn that back on so I can get all that information out of there."

q. "Fuck off, Eliott. Are you kidding me? What are you talking about? Eliott, turn my credit card back on or you're just gonna keep ramping up bills over here, man… You, you, you're not in a position to say, 'I'll

consider it.' That's not, that's not, you're not in that role, Eliott…. Eliott, are you gonna turn my credit card on or not? Yes or no? It's an easy question."

r. "So I would tell you this, man, don't do anything with my credit card. Fix my email. Fix my BetU account. I'll clean my email stuff out all out over the next week and get out of that. Eliott, I have one last question for you. Do you read my email?"

s. "But I am interested in, in getting all of the stuff off my email that I need."

t. "I don't wish anything bad on you, Eliott Bond. I wish nothing but the best for you in this business. I have a lot tied up in it, emotionally, physically, at my club, with my friends."

49. Defendant Thompson's above statements reflect his animosity, anger, and hostility toward Plaintiff Eliott Bond.

50. Defendant Thompson's above statements reflect his personal motivations in harming Plaintiffs, including his perceived reputational risk in his social circles, actions he took which were reflected in BetU records (hence, querying if Plaintiff had read his emails and asserting he would "clean" them up) and which conduct jeopardized BetU, his financial standing, and his plain disrespect for Plaintiff Eliott Bond.

51. The malice shown by Defendant Thompson's above statements actuated the false and defamatory statements set forth herein.

52. Defendant Thompson also, in that call, confirmed that he had already been working with Defendant Watts behind the scenes to accomplish their shared

goals, which included, without limitation, obtaining a collective ~$2.7 million buy out for $500,000 invested in a new technology start-up and the appointment of a Board that would allow them to control BetU, or else Plaintiff Eliott Bond face ruinous litigation:

a. "I did that out of a courtesy to you and I almost didn't read it until you had lunch with Watts [Monday morning] because I knew that was happening."

b. "I had a two hour discussion yesterday with one of our largest investors who clearly had significant concerns about what's going on."

c. "You have an investor group that doesn't know a thing about the business. And I know that was a message you got loud and clear yesterday [in your meeting with Watts]"

d. "He [Watts] said to me this afternoon, he said, 'Curt, this is gonna fail, isn't it?"

e. "Do you think Jonathan Watts's interest [in BetU] is better or worse with me involved?"

53. On July 22, 2024, Defendant Thompson sent an email to Defendant Watts stating, in part, "I will be pressing to get the things done that we will need if we need to try to sell this thing in short order or the right buyer comes along."

54. At that time, and all other pertinent times, neither Defendant Thompson nor Defendant Watts possessed the requisite authority to sell BetU.

55. Instead, Defendants Thompson and Watts were scheming on how to obtain that authority, which necessarily included Plaintiff Eliott Bond no longer

having decision-making authority or, apparently, getting him sent to rehab on the basis of false allegations of drug addiction such that he would have to relinquish control of his company.

56. A few minutes later, Defendant Thompson emailed Plaintiff Eliott Bond, with Defendant Watts blind copied, setting forth a call agenda, demanding records, and setting forth the structure for a new Board of Directors, which "must include appropriate shareholder representation." Defendant Thompson advised that Plaintiff Eliott Bond would "continue to be challenged," "for your protection, for mine, and for the shareholders."

57. Defendant Watts responded to Defendant Thompson, in part, "This guy has done nothing but take us backwards since my latest investment. He's got issues!"

58. On July 23, 2024, Defendant Thompson messaged again, closing with "I need to see a copy of the DNO policy from our insurer to clarify our protection as officers."

59. All of which was part and parcel of a larger scheme to intimidate Plaintiff Eliott Bond and gain control of BetU.

60. On July 24, 2024, Defendant Thompson appeared at Plaintiff Eliott Bond's parents' home ("Parents").

61. While there, Defendant Thompson asserted the following to the Parents:

a. Plaintiff Eliott Bond is addicted to cocaine

b. Plaintiff Eliott Bond has stolen money from BetU

c. Plaintiff Eliott Bond was supplied drugs by George Turnley Jr. at a company event

d. Plaintiffs are misappropriating BetU funds to make luxury purchases for Plaintiff Ashley Bond

e. Plaintiff Eliott Bond needs to go to rehab due to his drug addiction

f. Plaintiffs should be separated from their children

The above accusations are hereinafter referred to as the "July 2024 Accusations."

62. The July 2024 Accusations were made up out of whole cloth and had no basis in fact.

63. On August 2, 2024, Defendant Thompson e-mailed again, copying Defendant Watts, and asserting "Eliott, a lack of experience is one thing but a lack of character is something completely different. I can assure you that there will be a time in your life where things get cleaned up and you will have enormous regret about how you have handled yourself."

64. On August 4, 2024, Defendant Thompson texted the Parent(s): "… Eliott has hurt a lot of people to include my friends and my son. This will not just go away. He owes people money and answers."

65. On August 5, 2024, BetU delivered written correspondence formally

confirming Defendant Thompson's operational role at the company was terminated.

66. Afterward, Defendant Watts requested a meeting. During an August 14, 2024, meeting, Defendant Watts asserted directly to Plaintiff Eliott Bond that said Plaintiff is using cocaine and "snorting" Adderall, and that Watts and his wife had identified a rehab facility for said Plaintiff to attend.

67. Plaintiff Eliott Bond advised Defendant Watts that Defendant Thompson had made similar accusations to the Parents, and it appeared to Plaintiff that Watts already knew.

68. On August 24, 2024, Plaintiff Eliott Bond, through counsel, delivered a cease and desist letter to Defendants Thompson and Watts, which described the allegations of drug abuse as "lies."

69. Shortly after, Defendant Goldasich entered the picture.

70. Beginning on or about September 21, 2024, Defendant Goldasich made the following accusations to Dr. George Turnley Sr. at the Shoal Creek Country Club in Birmingham, Alabama, and by telephone:

a. Plaintiff Eliott Bond abuses illegal narcotics
b. Plaintiff Eliott Bond misappropriated company funds for drug purchases
c. Plaintiff Eliott bond stole company funds
d. Plaintiff Ashley Bond misappropriated company funds for luxury

purchases

e. Plaintiff Ashley Bond abuses illegal narcotics

f. Plaintiff Ashley Bond has been arrested for prescription-drug related offenses

g. Plaintiffs are utilizing a fake prescription scheme to obtain prescription drugs

The above accusations are hereinafter referred to as the "September 2024 Accusations."

71. The September 2024 Accusations were made up out of whole cloth and had no basis in fact.

72. In connection with the September 2024 Accusations, Defendant Goldasich also conveyed to Dr. Turnley that his clients, Defendants Thompson and Watts, knew that they would not recover the monetary value of their investment from Plaintiff Eliott Bond, but that suing him would place Plaintiff in a precarious financial situation.

73. Defendant Goldasich also conveyed to Dr. Turnley that his clients had buyers lined up to purchase BetU.

74. Plaintiffs did not discover the scope of the September 2024 Accusations until July 2026.

75. Defendant Goldasich continued to level similar accusations to Dr.

Turnley Sr. by telephone thereafter, including after September 2024.

Litigation Oriented Efforts to Take Over BetU

76. In December 2024 and January 2025, Defendants Goldasich and the Goldasich Firm began sending books and records requests on behalf of Defendants Thompson and Watts, and a third shareholder now also a plaintiff in the Fulton County Litigation.

77. On April 3, 2025, Defendant Watts made, among others, the following statements to Plaintiff Eliott Bond:

a. "You haven't been upfront about anything. You've lied about everything."

b. "So you took hundreds of thousands of dollars of mine. At a valuation of Eight Million [Dollars]. And I told you back in August that I was gonna fight for it…. So, there you go. I want my shares at 80 cents, which is what you told me they were worth."

c. "Okay. So either you're willing to buy us out at 80 cents a share or we're going to sue you for it. It's that simple."

d. [Responding to, "For what? For what reason? What's your claim?"] "I'll let the attorneys figure that out."

e. [Responding to, "You can't sue me for firing Curt"] "I can sue you for anything."

f. [Responding to, "You can't sue me for terminating an employee"] "Okay. Anything else?"

g. "I own part of this company. Whether you like it or not, I do."

h. [Responding to, "I'm glad to have you as an investor and a shareholder"] "Well, I'm not. I'm not glad that I invested. I'm not….

I don't know if it's a game to you. I don't know what it is. Uh, if you're just sifting funds to live off of, I don't know what you're doing, but that's why we have a court system. To sift all that out. So I hope you haven't been doing anything illegal because it'll come out in the end."

i. [Responding to, "This is an important piece of this because, that all's, those are things that both you said to me and to my parents, to their faces, knowing that it wasn't true"] "I didn't say anything to your parents. I said it to your face. I said I think that you're on drugs."

j. [Responding to, "And you know that you don't actually think that. And that's, there's no reason—"] "Why? The erratic behavior? Are you kidding me?"

k. "I hear you saying that, but quite honestly, I don't believe anything you tell me."

l. "I'm telling you I don't believe anything you say."

m. [Responding to, "You have no reason to think that I've done any of the things that you're alluding to. That I've blown all your money for personal gain and drugs"] "You're, you're putting words in my mouth. I asked how much money … that's not accusing you of it. That's saying I don't know if you are."

n. "I told you that I would only be willing to meet with you is if you were wanting to talk about buying *our* shares at 80 cents a share." [Emphasis added]

o. "So I, look, man, I've invested. There's, obviously there's nothing I can do about it. I have zero control over anything. You won't tell me anything. You won't, you, you don't, I mean, so I, I have no recourse but to fight other ways for my investment. That's it. Either buy me out or we'll do it through the court system."

78. Defendant Watt's above statements reflect his animosity, anger, and hostility toward Plaintiff Eliott Bond.

79. Defendant Watt's above statements reflect his personal motivations in harming Plaintiffs, specifically his financial investment and distrust of Plaintiff Eliott Bond.

80. Defendant Watts, like Defendant Thompson, demanded that Plaintiff Eliott Bond "buy out" his and other investors' shares, or else face litigation to discover allegedly possible facts Defendant Watts admitted then he did not know.

81. In his above statements, Defendant Watts acknowledged that he does not know if his allegations of drug abuse were true or false.

82. The malice shown by Defendant Watt's above statements actuated the false and defamatory statements set forth herein.

83. On May 16, 2025, BetU revoked Defendant Thompson's equity in BetU for cause.

84. On August 4, 2025, Defendants Goldasich and the Goldasich Firm sued Plaintiff Eliott Bond in the Fulton County Litigation.

85. In connection with the Fulton County Litigation, Defendants Thompson and Watts have effectively demanded that Plaintiff Eliott Bond give up his shares in BetU and/or buy them out of their shares in order to resolve the litigation.

86. On or around February 11, 2026, Defendant Goldasich made the following accusations to Mr. Scott Barranco, after the conclusion of a mediation of

the Fulton County Litigation:

a. Plaintiff Eliott Bond committed theft of company funds

b. Plaintiff Eliott Bond accomplished that theft through the creation of fake user accounts to take funds from company-owned user accounts

c. Plaintiff Eliott Bond engaged in fraud and/or material misrepresentations to Mr. Barranco while soliciting Mr. Barranco's investment in BetU

The above accusations are hereinafter referred to as the "February 2026 Accusations."

87. The February 2026 Accusations were made up out of whole cloth and had no basis in fact.

88. The falsity of the February 2026 Accusations was demonstrated to all Defendants at the mediation which had just culminated.

89. Although occurring in Atlanta, the February 2026 Accusations were made to an Alabama citizen—Mr. Barranco.

Defendants' Agency and Conspiracy

90. Plaintiffs pursue defamation claims for the September 2024 Accusations and the February 2026 Accusations.

91. The defamatory accusations at issue here are part and parcel of a

common design, purpose, and scheme by Defendants to take over BetU.

92. Defendants' collective conduct shows concerted action, a common goal, and a common scheme, including the mechanisms utilized in support thereof.

93. Defendant Goldasich made the September 2024 Accusations and the February 2026 Accusations to further, and within the scope of, his and Defendant Goldasich Firm's representation of Defendants Thompson and Watts.

94. Through their course of conduct or by explicit agreement, Plaintiff Eliott Bond asserts that, in response to the August 2024 cease and desist letter, all Defendants selected Defendant Goldasich to deliver the September 2024 Accusations to Dr. George Turnley Sr.

95. Defendant Goldasich made the September 2024 Accusations and the February 2026 Accusations for and on behalf of Defendants Goldasich Firm and their clients, Defendants Thompson and Watts.

96. Defendants' actions show concert of action, a common design, and a common purpose—to harm Plaintiffs and take over BetU.

97. Defendants have a shared interest in accomplishing that common purpose—their investments in BetU, friendships, financial standing, and related legal representation.

98. Defendants Thompson and Watts each expressed their approval of one another's individual publications to Plaintiff Eliott Bond and his Parents.

99. Defendants Goldasich and Goldasich Firm have shown their approval of the September 2024 Accusations and February 2026 Accusations through their representation and the making of the statements themselves.

100. Prior to the September 2024 Accusations, Defendants Thompson and Watts had already leveled substantially similar accusations to Plaintiff Eliott Bond and his Parents, separately.

101. The February 2026 Accusations were made with of Defendants Thompson and Watts nearby, immediately following a mediation in which each were represented by Defendants Goldasich and Goldasich Firm.

102. The acts and omissions of an attorney at law are to be regarded as acts of the client whom he represents.

<u>Defendants' Fault and Malice for their False Speech</u>

103. Defendants published the September 2024 Accusations and the February 2026 Accusations negligently and with actual malice, i.e., with knowledge of falsity or in reckless disregard of the truth.

104. Defendant Thompson made up out of whole cloth the July 2024 Accusations.

105. Defendant Thompson made up the July 2024 Accusations for the reasons set forth above, including without limitation, because he harbored malice and disrespect for Plaintiff Eliott Bond, because Thompson knew Thompson himself

had engaged in misconduct involving BetU's platform and finances, because he perceived reputational risk within his country club and with the investors he had solicited, and because of his financial standing.

106. All Defendants lacked any reasonable basis on which to accuse Plaintiffs of drug use or abuse, including because neither does so and no Defendant has therefore ever witnessed Plaintiffs doing so.

107. Excepting one short and immaterial interaction at a company function, no Defendant has ever met Plaintiff Ashley Bond.

108. Defendants Goldasich and Goldasich Firm have never met Plaintiff Ashley Bond.

109. All Defendants knew and recklessly disregarded that there is no record of Plaintiff Ashley Bond being arrested for illegal drugs or otherwise, including because there is none because she never has been so arrested.

110. Though Defendant Watts claims he and his wife identified a rehab facility for Plaintiff Eliott Bond, he knew that he had no factual basis to accuse him of drug use in the first place.

111. Instead, both Defendants Thompson and Watts expressed desire to send said Plaintiff to rehab was to get him out of the picture at BetU.

112. At no time has Defendant Thompson, or any other Defendant, possessed any credible information that either Plaintiffs stole or otherwise

misappropriated BetU funds, for personal gain or otherwise, because it never happened and thus such evidence does not exist.

113. In respect of all financial misconduct accusations, Defendants knew and disregarded that they lacked any evidence of misconduct.

114. In respect of all financial misconduct accusations, Defendants knew and disregarded the significant work and expenses associated therewith in designing, implementing, marketing, and running the BetU application.

115. In respect of all financial misconduct accusations, Defendants knew and disregarded that they had no evidence that BetU owned player accounts were being utilized by Plaintiffs to siphon money from the company, for any reason whatsoever, much less drug use and luxury purchases.

116. To the extent that any other Defendant relied upon Defendant Thompson as their sole source, they did so in reckless disregard of their knowledge that he was biased and unreliable.

117. To the extent that any other Defendant relied upon Defendant Thompson as their sole source, they did so in reckless disregard of their knowledge that Thompson possessed no information supporting the false accusations at issue here.

118. All Defendants received the August 2024 cease and desist letter, and the September 2024 Accusations and February 2026 Accusations were published

nonetheless.

119. Defendant Watts was directly confronted by Plaintiff Eliott Bond, prior to the September 2024 Accusations, with the fact that the drug use allegations are false.

120. Defendant Watts has admitted to Plaintiff Eliott Bond that he does not know whether the allegations of drug abuse are true.

121. In addition to knowledge of falsity, all Defendants have acted in purposeful avoidance of the truth.

122. Defendant Thompson, despite the severity of his accusations to Plaintiff Eliott Bond's Parents—who have no role at BetU—and despite the litany of occasions in which he spoke angrily and disrespectfully to Plaintiff Eliott Bond, has never confronted Plaintiff Eliott Bond with his false accusations of drug use.

123. The other Defendants, despite knowing the animosity Defendant Thompson had toward Plaintiff Eliott Bond, either failed to conduct any diligence whatsoever by, e.g., searching for any record of an arrest or having any other confirming source of information, or conducted such diligence and found no supporting information.

124. All Defendants acted for an ulterior, self-interested purpose—gaining control of BetU.

125. The September 2024 and February 2026 Accusations were, in any case,

inherently improbable and no reasonable or prudent person would have placed them in circulation.

126. As each other's agent, and/or as co-conspirators, the fault of each of the Defendants is attributable to the other.

Demand for Retraction

127. After discovering in July 2026 that Defendants' false speech did not just attack him, but also his wife, Plaintiff Ashley Bond, Plaintiffs delivered written retraction demands to each Defendant on or around August 12, 2026.

128. No Defendant has provided any type of response to the retraction demand, to dispute that they made the July 2024 Accusations, September 2024 Accusations, or February 2026 Accusations, or to provide any possible basis on which said accusations were made.

129. No Defendant has issued a retraction.

**FIRST CAUSE OF ACTION:**

**Defamation for the September 2024 Accusations**

130. Plaintiffs incorporate by reference paragraphs 1 through 129 of this Complaint as though set forth in their entirety.

131. Beginning September 21, 2024, and continuing thereafter, Defendant Goldasich published the September 2024 Accusations to at least one third party, Dr. George Turnley Sr.

132. In particular, Defendant Goldasich conveyed the following statements and defamatory meanings:

a. Plaintiff Eliott Bond abuses illegal narcotics
b. Plaintiff Eliott Bond misappropriated company funds for drug purchases
c. Plaintiff Eliott bond stole company funds
d. Plaintiff Ashley Bond misappropriated company funds for luxury purchases
e. Plaintiff Ashley Bond abuses illegal narcotics
f. Plaintiff Ashley Bond has been arrested for prescription-drug related offenses
g. Plaintiffs are utilizing a fake prescription scheme to obtain prescription drugs

133. Dr. Turnley Sr. understood the statements accordingly.

134. Defendant Goldasich's September 2024 Accusations were published without privilege.

135. No pending litigation existed at the time of the September 2024 Accusations.

136. In any case, the Fulton County Litigation does not include the content of the September 2024 Accusations, and those accusations could not be a fair or

accurate summary of that litigation.

137. Defendant Goldasich was acting for and on behalf of Defendants Goldasich Firm, Thompson, and Watts.

138. Defendant Goldasich, through an explicit or tacit agreement, conspired with Defendants Goldasich Firm, Thompson, and Watts to defame Plaintiffs to Dr. Turnley Sr.

139. The September 2024 Accusations are false.

140. The September 2024 Accusations are of and concerning Plaintiffs.

141. Defendants published the September 2024 Accusations negligently and with actual malice as set forth herein, including, without limitation, because:

a. Defendant Thompson made up the allegations out of whole cloth;

b. Defendants Goldasich, Goldasich Firm, and Watts knew and disregarded that Thompson possessed ulterior motives and a strong bias against Plaintiffs;

c. All Defendants lacked any firsthand knowledge of the alleged drug and financial misconduct;

d. All Defendants lacked any credible secondhand information of the alleged drug and financial misconduct;

e. The allegations against Plaintiff Ashley Bond would be a matter of public record, which record does not exist because she has never

been arrested for drug use;

f. All Defendants were confronted by Plaintiff Eliott Bond regarding the falsity of their accusations prior to the September 2024 Accusations;

g. Defendant Watts has admitted he does not know the truth of the matter;

h. Excepting a single short interaction, no Defendant has ever met Plaintiff Ashley Bond;

i. All Defendants acted with an improper and ulterior purpose, which was to obtain control of BetU; and

j. Despite all being confronted anew with the falsity of their allegations via retraction demands, no Defendant has even responded much less issued a retraction.

142. Defendants Thompson's and Watts' assertion that Plaintiff Eliott Bond needed to go to rehab was nothing but a ploy to remove him from BetU, and thus necessitated the false allegations of narcotics abuse.

143. Defendants published the September 2024 Accusations with the knowledge and intent of harming Plaintiffs.

144. The September 2024 Accusations are defamatory per se, in that they accuse Plaintiffs of criminal conduct.

145. The September 2024 Accusations are defamatory per se, in that they ascribe to Plaintiff Eliott Bond misconduct in his vocation and otherwise ascribe to him traits and conduct that are incompatible with running BetU.

146. Because the September 2024 Accusations are defamatory per se, general damages to Plaintiffs are presumed as a matter of law.

147. The September 2024 Accusations additionally caused Plaintiffs actual reputational, emotional, and mental damages in an amount exceeding $75,000 and to be determined at trial.

148. Defendants published the September 2024 Accusations with common law malice, with the intent to injure and reckless disregard for the rights of Plaintiffs, and Plaintiffs are accordingly entitled to an award of punitive damages to deter Defendants from repeating such misconduct in the future.

149. Defendants acted with malice, bad faith, and willful negligence such that Plaintiffs are entitled to an award of their reasonable attorneys' fees and expenses of litigation.

**SECOND CAUSE OF ACTION:**

**Defamation for the February 2026 Accusations**

150. Plaintiff Eliott Bond incorporates by reference paragraphs 1 through 129 of this Complaint as though set forth in their entirety.

151. On or around February 11, 2026, Defendant Goldasich made the

following accusations to Mr. Scott Barranco:

a. Plaintiff Eliott Bond committed theft of company funds

b. Plaintiff Eliott Bond accomplished that theft through the creation of fake user accounts to take funds from company-owned user accounts

c. Plaintiff Eliott Bond engaged in fraud and/or material misrepresentations to Mr. Barranco while soliciting Mr. Barranco's investment in BetU

152. Mr. Barranco understood the statements accordingly.

153. Defendant Goldasich's February 2026 Accusations were published without privilege, including because they were not made within the confines of a judicial proceeding, were not made within a mediation, do not reflect the content of the allegations at issue in the Fulton County Litigation, and were, in any case, published with malice as described herein.

154. Defendant Goldasich was acting for and on behalf of Defendants Goldasich Firm, Thompson, and Watts.

155. Defendant Goldasich, through an explicit or tacit agreement, conspired with Defendants Goldasich Firm, Thompson, and Watts to defame Plaintiffs to Mr. Barranco.

156. The February 2026 Accusations are false.

157. The February 2026 Accusations are of and concerning Plaintiff Eliott Bond.

158. Defendants published the February 2026 Accusations negligently and with actual malice as set forth herein, including, without limitation, because:

a. Defendant Thompson made up the allegations out of whole cloth;

b. Defendants Goldasich, Goldasich Firm, and Watts knew and disregarded that Thompson possessed ulterior motives and a strong bias against Plaintiffs;

c. All Defendants lacked any firsthand knowledge of the alleged financial misconduct;

d. All Defendants lacked any credible secondhand information of the alleged financial misconduct, despite having been in litigation with Plaintiff Eliott Bond since August 2025;

e. All Defendants knew that the allegations made had just been wholly contradicted during the conduct of the mediation;

f. All Defendants acted with an improper and ulterior purpose, which was to obtain control of BetU; and

g. Despite all being confronted anew with the falsity of their allegations via retraction demands, no Defendant has even responded much less issued a retraction.

159. Defendants published the February 2026 Accusations with the knowledge and intent of harming Plaintiff Eliott Bond.

160. The February 2026 Accusations are defamatory per se, in that they accuse Plaintiff Eliott Bond of criminal conduct, including theft and theft by deception.

161. The February 2026 Accusations are defamatory per se, in that they ascribe to Plaintiff Eliott Bond misconduct in his vocation and otherwise ascribe to him traits and conduct that are incompatible with running BetU.

162. Because the February 2026 Accusations are defamatory per se, general damages to Plaintiff Eliott Bond are presumed as a matter of law.

163. The February 2026 Accusations additionally caused Plaintiffs actual reputational, emotional, and mental damages in an amount exceeding $75,000 and to be determined at trial.

164. Defendants published the February 2026 Accusations with common law malice, with the intent to injure and reckless disregard for the rights of Plaintiff Eliott Bond, and said Plaintiff is accordingly entitled to an award of punitive damages to deter Defendants from repeating such misconduct in the future.

165. Defendants acted with malice, bad faith, and willful negligence such that Plaintiff Eliott Bond are entitled to an award of their reasonable attorneys' fees and expenses of litigation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Eliott and Ashley Bond respectfully petition this Honorable Court for the following relief:

a) That Summons and Process issue as provided by law;

b) That Plaintiffs be granted a trial before a jury of their peers;

c) That Plaintiffs be granted judgment and all appropriate damages, including compensatory damages in excess of $75,000.00, against Defendants;

d) That Plaintiffs be granted an award of attorneys' fees and costs in an amount to be proven at trial;

e) That Plaintiffs be granted an award of punitive damages in an amount to be proven at trial; and

f) For such other and further relief as the Court may deem just and proper.

Respectfully submitted this 17th day of September, 2026.

*/s/ John Parker Yates*
**JOHN PARKER YATES**
YATES ANDERSON LLC
2320 Highland Ave. S., STE 290B
Birmingham, AL 35205
Phone: (205) 705-3144
parker@yatesanderson.com

**WADE, GRUNBERG & WILSON, LLC**

G. Taylor Wilson
(Motion to appear *pro hac vice* forthcoming)
GA Bar No. 460781
twilson@wgwlawfirm.com

3100 Cumberland Blvd. SE, Ste. 1130
Atlanta, Georgia 30339
404-600-1153
470-970-4303 (fax)

*Counsel for Plaintiffs Eliott and Ashley Bond*

## JURY DEMAND

Plaintiffs demand a trial by a struck jury on all issues allowable by law in this case.

*/s/ John Parker Yates*